UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-36 (NEB/DTS)

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

DAYTON CHARLES SAUKE,

          Defendant.

**GOVERNMENT'S POST-HEARING
RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS
EVIDENCE**

The United States of America, by and through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Justin A. Wesley, Assistant United States Attorney, respectfully submits this reply to Mr. Sauke's motion to suppress his statement (DCD 30) and evidence obtained during the execution of federal warrants (DCD 34). The government opposes these motions because Mr. Sauke merely provided pedigree information and an unresponsive comment that the ATF "should be a convenience store." Such statements were not protected by *Miranda*. Furthermore, the warrants were supported by probable cause, and Mr. Sauke did not provide any other basis for the fruits of the warrants to be suppressed. Therefore, both motions should be denied.

## I.    Argument

### a. Motion to Suppress Statement (DCD 30).

The circumstances surrounding Mr. Sauke's interview are not substantially in dispute. The interview itself was recorded and those recordings were entered into evidence as Government's Exhibits 4 (audio) and 5 (audio and video). The government agrees that there is no question Mr. Sauke was in custody for *Miranda* purposes. The entire interaction between the agents and Mr. Sauke was brief (approximately 10 minutes). The agents asked routine booking questions, both before and after a *Miranda* warning was given. No "enhanced interrogation" techniques were employed. Mr. Sauke did invoke his fifth amendment right to remain silent. (Gvt. Ex. 5 at 5:58). However, the parties disagree as to whether what happened next constituted custodial interrogation.

The two issues before the Court are, first, whether the routine booking questions should be suppressed. Second, whether Mr. Sauke's statement that the ATF "should be a convenience store" should be suppressed. (Gvt. Ex. 5 at 8:20-8:23).

### i. *Legal Framework*

*Miranda* safeguards come into play whenever a person in custody is subjected either to express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In other words, custodial interrogation includes express questioning, as well "any words or actions on

2

the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Id.*) (emphasis added). This definition even focuses on the "perceptions of the suspect, rather than the intent of the police." (*Id.*) However, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Id.* at 301-02) (emphasis in original).

Additionally, there are certain questions by law enforcement and even certain statements made by suspects that fall outside of the protections of *Miranda*. For example, law enforcement is entitled to gather routine booking information, such as "name, address, height, weight, eye color, date of birth, and current age" even though gathering such information qualifies as custodial interrogation because these questions fall within a "routine booking question" exception. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Even if the answer to the routine booking question may be incriminating, it is not necessarily a product of interrogation for *Miranda* purposes. *U.S. v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (only if the interviewer should reasonably be aware that the information sought during routine booking procedures is directly relevant to the substantive offense charged "will the question be subject to scrutiny")

3

(quoting *U.S. v. McLaughlin* 777 F.2d 388, 391-92 (8th Cir. 1985)). A suspect can likewise make a spontaneous statement in response to a statement or question by a law enforcement officer, so long as the question or statement does not constitute interrogation. *U.S. v. Chipps* 410 F.3d 438, 445 (8th Cir. 2005); *U.S. v. Jones*, 842 F.3d 1077, 1083 (8th Cir. 2016) (after invoking his right to remain silent, the interviewer said he would "send him back to his cell if he did not want to talk" and the defendant thereafter made an incriminating statement).

### i. The defendant's statements.

After introductions and making Mr. Sauke more comfortable by placing his handcuffs in the front, asking if he'd like his gloves removed, and offering and providing Mr. Sauke with water[1] (Gvt. Ex. 5 1:20 to 3:31), S.A. Thomas obtained the correct pronunciation and spelling of the defendant's name, his date of birth, address, and telephone number (Gvt. Ex. 5 at 3:50-4:26). S.A. Thomas then proceeded to read the defendant his *Miranda* rights from a form,[2]

---

[1] The defense paints the interview as one of agents disrespecting Mr. Sauke's rights, and even notes that Mr. Sauke was offered water but writes "it is not clear that any was provided." (DCD 58 at 2.) Water was in fact provided, and true to the altruism demonstrated by the government agents in this case, S.A. Thomas even opened the water bottle for Mr. Sauke. (Gvt. Ex. 5 at 5:28-5:50).

[2] Mr. Sauke appears to take issue with the wording of the *Miranda* warning provided in this case, noting that S.A. Thomas told Mr. Sauke "that anything he said 'can be used' against him, not that it can and will. (DCD 58 at 2). However, this is how the United States Supreme Court laid out the "now

4

confirmed he understood his rights, and asked if he was "willing to talk to us?", to which the defendant responded, "I don't want to talk." Gvt. Ex. 5 at 4:48-6:00). S.A. Thomas responded, "that's completely fine." (Gvt. Ex. 5 at 6:02).

After this invocation of his right to remain silent, Sgt. Thomas unequivocally told the defendant, "we're not going to ask you any more questions since you don't want to talk." (Gvt. Ex. 5 at 6:08-6:10). "But I do want to let you know [sic] the process going forward and get a little bit of more information from you just for booking." (Gvt. Ex. 5 at 6:10-6:19). At the hearing, S.A. Thomas explained the need to get certain information from persons for the U.S. Marshals to properly process the person.

S.A. Thomas commented to Mr. Sauke that she already had his name, address, and phone number, and asked if he wanted anyone to be contacted. (Gvt. Ex. 5 (6:21-6:28). The agents then asked for his social security number, and if he was born in Minnesota, 6:56-7:22). She then proceeded to explain, "what is going to happen moving forward…" (Gvt. Ex. 5 at 7:22-7:55). This included what he was being charged with and how he would be transported into federal custody.

---

familiar *Miranda* warnings—namely, that the defendant be informed 'that he has the right to remain silent, that anything he says **can be used against him** in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires'—or their equivalent." *Innis*, 446 U.S. at 297 (emphasis added) (quoting *Miranda* 384 U.S. at 479).

Based on the defendant's demeanor, S.A. Gulick said, "I just want to make sure before we leave and you start going through the process now is your opportunity to ask us questions" and reiterates "I understand you don't want to talk to us." (Gvt. Ex. 5 at 7:57- The defendant then asks, "what kind of court does the ATF do?" In answering the question, S.A. Gulick explained the ATF was a federal agency and asked if the defendant had any experience with the ATF or if he knew anything about the ATF. (Gvt. Ex. 5 at 8:16-8:20). Rather than answering with a simple yes, no, the defendant unexpectedly made a comment that the ATF "should be a convenience store." (Gvt. Ex. 5 8:20-22). Despite this cavalier comment, the agents continued to explain the process of what would happen next. The agents then left after this explanation of the court process.

In summary, after the defendant invoked his right to remain silent, the ATF agents merely obtained the final information they needed for the U.S. Marshal's booking paperwork and explained what would happen next. The interview then ended. (Gvt. Ex. 5 at 10:43). At no point during this entire interview did any interrogation occur.

Furthermore, the ATF agents exhibited a particularly caring approach in ensuring Mr. Sauke was comfortable and understood what steps came next in the process. The ATF agents were merely making sure that this defendant, who had not been through the federal system before, understood what would

6

happen next. The question during this explanation, "do you know what the ATF does?," was not a question designed to elicit an incriminating response. In fact, it is quite surprising that a person would answer such a question with anything but a simple yes or no under the circumstances. It is a far stretch to argue that this question, in the context in which it was asked, could be considered "custodial interrogation."

In *Rhode Island v. Innis*, officers were transporting a murder/kidnapping/robbery suspect, but the shotgun involved in the offense had yet to be found. 446 U.S. at 294-95. After the suspect invoked his right to counsel, the transporting officers began a conversation about how "God forbid [a child] might find a weapon with shells and they might hurt themselves." *Id.* The suspect promptly told the officers to turn around so he could show them where the gun would be found. The United States Supreme Court considered this conversation to be "subtle compulsion,"[3] but not "custodial interrogation." *Id.* at 303.

In *U.S. v. Chipps*, an FBI agent was fingerprinting the appellant and informed the appellant he had been one of the law enforcement officers who

---

[3] The government in no way concedes that what happened here was even remotely comparable to subtle compulsion. Here, the agents were clearly trying to make sure Mr. Sauke understood the process. S.A. Thomas specifically testified at the hearing that she was not trying to circumvent *Miranda*. The government is just providing a sliding scale of examples that are still not considered "interrogation."

tried to stop the appellant the day prior. 410 F.3d at 444. The appellant said he would have pulled over and not led the officers on a high-speed pursuit had they been in marked vehicles. *Id.* Nevertheless, the appellant said he knew the FBI had been looking for him. *Id.* The FBI agent then said they had been looking for him for a long time, and asked the appellant how long he had known he had a warrant. *Id.* at 445. The appellant said he found out about it three years earlier. *Id.* The Court found that the FBI agents comments did not constitute interrogation because they were not likely to elicit incriminating evidence. *Id.* The other statements were found to be admissible "as a spontaneous statement made during a conversation not initiated by the officer" or merely responses to permissible clarifying questions *Id.*

The agents in this case were not using "subtle compulsion" or even making comments about their involvement in the investigation. They were merely explaining the federal court process from charging, booking, transport, delays due to the holiday weekend, and what would happen when Mr. Sauke ultimately arrived in federal court. During this explanation, Mr. Sauke made a comment about the ATF being a convenience store. This statement was not in response to interrogation, it is not protected by *Miranda*, and it should not be suppressed under these circumstances.

### b. Motion to Suppress Evidence (DCD 34).

Mr. Sauke's motion to suppress evidence from the three search warrants in this case should be denied because the warrants were supported by probable cause. No legal argument was made in Mr. Sauke's post-hearing filing. (DCD 58.) Therefore, the only analysis to be conducted, if any, is for the Court to determine if the four-corners of the warrants establish probable cause.

### i. Legal framework.

In analyzing the validity of a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)). "The affidavit 'should be examined under a common sense approach and not in a hypertechnical fashion.'" *Id.* (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). Because judicial warrants are the preferred vehicle for police searches, courts must give "'great deference to a magistrate's determination' as to whether an affidavit establishes probable cause." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)). In accordance with the highly deferential review afforded to search warrants, this Court does not examine the warrant "to see whether the magistrate judge was presented with probable cause; instead, [the Court] need only ensure that the issuing official had a *substantial basis* to conclude that probable cause existed." *United States v. Anderson*, 933 F.2d 612, 614 (8th Cir. 1991) (emphasis added).

9

In so doing, the reviewing court must be cognizant that the issuing judge is entitled to "draw reasonable inferences . . . in determining whether probable cause exists." *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).

Probable cause exists when a person of reasonable caution could believe from the available facts that contraband or evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013). Probable cause does not require officers to show that a crime is *actually* occurring or that evidence *will* be found, but rather requires only that officers show "a probability or substantial chance" that the search will yield evidence of a crime. *United States v. Payne*, 119 F.3d 637, 642 (8th Cir. 1997) (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)). In other words, all that is required is a "fair probability" that the object of the search warrant may be found in the place to be searched. *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009). As the Supreme Court has repeatedly and recently noted, "probable cause is not a high bar."' *D.C. v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 586 (2018) (citations omitted).

The warrant affidavit for the search of Mr. Sauke's person and residence (Gvt. Ex. 1) lays out an extensive investigation into Mr. Sauke's drug dealing and firearms activity. The appropriate nexus is made between the crimes and his person and his residence. A federal Magistrate Judge reviewed the affidavit and determined that there was probable cause for the issuance of the warrant. Similar extensive evidence was also included in the warrants for Mr. Sauke's

10

vehicle (Gvt. Ex. 2) and electronics (Gvt. Ex. 3). Furthermore, the vehicle warrant was obtained out of an abundance of caution even though the agents may well have had the right to search the vehicle under the automobile exception. (Gvt. Ex. 2 at ¶ 53); s*ee U.S. v. Ventresca*, 380 U.S. 102, 105 (1965) (explaining the reasons for the preference for search warrants, and further stating "that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fail." *Id.* (citation omitted).

The issuing magistrates had a substantial basis for issuing these warrants, and even further considering the preference for warrants, the Court should deny Mr. Sauke's motion to suppress evidence.

## II.    Conclusion

For all of the aforementioned reasons, the government respectfully requests that the Court deny Mr. Sauke's Motions to Suppress Statements (DCD 30) and Evidence (DCD 34).

Dated: June 11, 2021                    Respectfully Submitted,

W. ANDERS FOLK
Acting United States Attorney

*/s/ Justin A. Wesley*

BY:  JUSTIN A. WESLEY
Assistant U.S. Attorney
Attorney ID No. 0389189

11